UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JAMES PIERLE, ) | |
|     Plaintiff, ) | |
| ) | |
| vs. ) | 1:07-cv-0695-LJM-TAB |
| ) | |
| THE CHILDREN'S MUSEUM ) | |
| OF INDIANAPOLIS, INC., ) | |
|     Defendant. ) | |

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, James Pierle ("Pierle"), brings two retaliation claims against defendant, the Children's Museum of Indianapolis, Inc. (the "Museum"), after the Museum terminated his employment on June 12, 2006. Pierle alleges first that the Museum terminated his employment in retaliation for his having complained of harassment by a co-worker about his medical condition. He alleges secondly that he was terminated after, and because of, his request for leave under the Family and Medical Leave Act ("FMLA"). The Museum denies both allegations and asserts that it terminated Pierle solely because he was insubordinate and disrespectful to his immediate supervisor, Sharon Hendrickson ("Hendrickson"), during a meeting on June 6, 2006.

For the reasons stated herein, the Court **GRANTS** the Museum's Motion for Summary Judgment.

### I. SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just,

speedy, and inexpensive determination of every action.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990).  Motions for summary judgment are governed by Federal Rule of Civil Procedure 56 (c) ("Rule 56(c)"), which provides in relevant part:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which she relies.  *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).  When the moving party has met the standard of Rule 56, summary judgment is mandatory.  *See Celotex*, 477 U.S. at 322-23; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party.  *See Estate of Cole v. Fromm*, 94 F.3d

254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). "If the nonmoving party fails to establish the existence of an element essential to [her] case, one on which [she] would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

## II. DISCUSSION

### A. CO-WORKER HARASSMENT

The Court turns first to Pierle's allegation that he was terminated for complaining about harassment by a co-worker for his medical condition, which Pierle contends violated the Americans with Disabilities Act ("ADA"). The Court concludes that such a cause of action does not exist. Pierle alleges that the Museum terminated his employment in retaliation for his having complained that a co-worker made light of his prostatitis condition. He points to one statement made by a co-worker. After investigation by Pierle's supervisor, an apology was extended. Pierle complains about the way in which his complaint was investigated and ultimately handled. But, he has neither argued nor established that he was in fact disabled under the ADA. A rude remark by one co-worker about another does not beget a cause of action under the ADA in favor of the insulted against his employer. Recipients of rude remarks are not in a protected class.

In a related, but un-pled argument, Pierle asserts that when he met with Hendrickson to complain that he had been harassed by a co-worker, she threatened him with "'repercussions" if he took his complaint to Hendrickson's boss or to the Human Resources Department ("HR"), which evidences that the Museum retaliated against him when it terminated his employment. The facts do not support such an allegation.

On page forty-nine of Pierle's deposition he describes the conversation with Hendrickson as follows: "And I made mention that in my meeting with Sharon [Hendrickson] that she had tried to discourage me from taking the matter up with HR because of the repercussions that might come from such a thing. I think it was just a matter of being protective in some sense."

Hendrickson recalls the conversation as follows: "I told him that I should–that he should allow me the opportunity to look into it. I got–every day, literally, someone was in my office complaining about someone else, so I spent a good amount of my time just tracking stuff down between what he said, she said. So I had to assume this was another one of those incidents that could have happened but was blown out of proportion, so I wanted the chance to check into it before anything got reported to HR . . . so I always said, 'Let me look into it before anybody runs off to HR and files a complaint.' I did that with everybody, not just [Pierle]." Hendrickson Dep. at.49.

Pierle argues that based on these statements is it reasonable to infer that "Hendrickson attempted to dissuade Pierle from going to HR regarding the incident and told Pierle that, if he went to HR, there would be repercussions." Further, Pierle contends, "Pierle was not dissuaded by Hendrickson's threats." No further reference from the record is offered to support the statement that Pierle was threatened with repercussions if he went to HR with his complaint.

4

Neither the quote of Pierle nor that of Hendrickson supports this inference. Pierle himself admits that he was discouraged from going to HR because Hendrickson was being protective. The only reasonable inference from the testimony, then, is that Hendrickson was trying to keep the situation from growing into a larger issue. Therefore, there is nothing in the record to support a claim that Pierle was fired because he wanted to take his harassment complaint directly to HR.

### B.  RETALIATION FOR REQUESTING FMLA LEAVE

Pierle alleges that in April 2006, he notified Hendrickson that he was suffering from a serious health condition and that the condition required him to take time off work. The notice was contained in an e-mail in which, while discussing a medical condition, he stated, "A lot of my recent dates taken for [Personal Time Off ("PTO")] have related towards dealing with finding a solution to this problem." Hendrickson Dep. at 42-43. Pierle requested intermittent FMLA leave on May 15, 2006.

On May 15, 2006, the Museum, through benefits co-ordinator, Laura Hagy ("Hagy"), provided Pierle with the forms necessary to make his application for intermittent benefits. Hendrickson Dep. Ex. 24. Hagy sent a notice of what she had done to Hendrickson that same day. Def.'s Ex. E. Pierle's doctor executed the appropriate certification, yet the FMLA application was not delivered to Hagy until June 6, 2006. Hagy asked Pierle for information detailing restrictions or accommodation on June 9, 2006, and notified Hendrickson of the request. The additional information was not given to Hendrickson until after Pierle was terminated. The completed form was delivered by Pierle to Hagy on the afternoon of the day he was terminated . Pierle Dep. at 124.

Hendrickson asked Pierle to come and see her on June 6, 2006. Hendrickson had been asked by her supervisor, Cathy Ferree ("Ferree"), to determine why things were not moving more quickly in the Garden of Glass exhibit, a project to which Pierle was assigned. Hendrickson reports on the meeting and its purpose as follows:

> . . . [W]hat was revealed was that [Pierle] was not working on the project as much as he should have, and there were some time periods on there that were unusual. There were a number of hours that really couldn't be accounted for, so they were dropped into categories that made no sense. So I [] call[ed] him in [] to ask what—where he had been during these times or what he had been doing during these times. Not that he wasn't there, because he had told me that he would probably need to be taking more time off for his health condition. So there was just this number of hours and I wanted to find out what they were. When I called Jim in to ask him what he was doing during these times, he got really defensive. And I just—I wasn't trying to say he wasn't working. I just didn't know what they were because I was having to go back and account for what everybody was doing. Everybody was under a lot of scrutiny at that time.
>
> So he got very defensive and the conversation veered off from, "What was your time on these topics" to him saying that I wasn't doing my job and I was not responsible and I wasn't helping him. And then one thing led to another and the conversation—I think it got off onto the fact that his review was not going to be the best. I wanted to hear what he had to say about that. Like with everybody, I gave them an opportunity to prove me wrong and he couldn't. And he got more emotional and his voice got louder, and at one point, I just remember getting frustrated and I raised my voice back and just—you know, I didn't want him standing there yelling at me. I told him this meeting was over. I had to go to another meeting and ended it.

Hendrickson Dep. at 70-72.

After Pierle left her office, Ferree came into Hendrickson's office and told her that people could hear the conversation down the hall and that Ferree had spoken with Jennifer Robinson ("Robinson") and decided that type of behavior would not be tolerated and that they felt Pierle's behavior was grounds for termination. *Id.* at 72. Ferree advised Hendrickson that Ferree and

Robinson thought Hendrickson should document the conversation and start the termination process. *Id.* Robinson was Ferree's supervisor.

Hendrickson documented the meeting in the form of a memo dated June 7, 2006. Hendrickson Dep. Pl.'s Ex. 30.

At the time of Pierle's conversation with Hendrickson, Robinson was unaware of his request for FMLA leave. Robinson Dep. at 15. Robinson was not aware of the request for leave prior to Pierle's termination. *Id.* Robinson recalls hearing Pierle yelling at Hendrickson. *Id.* at 16. She wrote up a report of the incident, but was not asked to prepare it until July 2006. *Id.* Def.'s Ex. 43.

According to Robinson, Ferree and Charity Counts ("Counts") also heard the conversation between Pierle and Hendrickson. *Id.* at 21. Robinson reported in an email that "[a]dditional staff in the area could hear the yelling as well." *Id.* Def.'s Ex. 44. Robinson testified that Pierle was loud enough to cause Robinson to become concerned for Hendrickson's safety. *Id.*; *id.* at 22.

Pierle recalls the meeting with Hendrickson differently. Pierle recalls that he went to the meeting with Hendrickson thinking that he and Hendrickson would address a problem with his time sheets. Pierle Dep. at 71. Instead, the conversation turned to a negative upcoming review. *Id.* He asserts that this change of topic surprised him. *Id.* He denies that he got angry and raised his voice. *Id.* at 71-72. He relates that the change in topics put him in a defensive posture. *Id.* at 77. He does recall talking loudly. *Id.* at 71-72. Pierle asserts that Hendrickson was the aggressor. *Id.* at 77.

On June 7, 2006, Hendrickson documented her version of the meeting in a memo. Hendrickson Dep. Pl.'s Ex. 30. In the memo, Hendrickson described the subject matter she intended to cover her June 6, 2007, meeting with Pierle. Hendrickson wrote that she asked Pierle to account for his time and he responded that there "had been lots of dead time." *Id.* She recalls that he became

very defensive and began accusing others of working against him. *Id.* When she mentioned negative feedback from other workers regarding his annual review about his not carrying his weight, he became agitated. *Id.* As the conversation continued he questioned her ability to control others negative behavior toward him. *Id.* He became belligerent and began screaming at her. *Id.* Hendrickson commented in the memo, "I could not believe the insubordination and disrespect he was showing me, and at one point I really did not know how far he would have taken his outrage if I had not shut down the situation by bringing an end to the meeting and stating that I needed to leave for another meeting." *Id.* As Pierle's supervisor, Hendrickson concludes, "He obviously is argumentative, insubordinate and based on comments from his coworkers, cannot be trusted or counted on to do his share of the work. At this time I am recommending termination of Jim Pierle based on his recent unacceptable actions and work history over the past year." *Id.*

On June 8, 2006, Katy Allen Burns ("Allen"), the Museum's Vice President of Human Resources, wrote an email to Hendrickson, Robinson and Ferree. Hendrickson Dep. Pl.'s Ex. 5. In the email Allen indicates that she is putting together a plan to terminate Pierle's employment and that she needed information from them. *Id.* Specifically, Allen said, "I trust you all agree—we cannot allow for Sharon or anyone else to be threatened or intimidated. [Pierle] is a liability and I do not think that he should be in the building.—[sic]if any of you feel differently, please let me know." *Id.*

According to Allen, the reason for terminating Pierle's employment would be insubordination. Allen Dep. at 71. Specifically, Allen reasoned, "And from the accounts from Sharon and Cathy and Jennifer, what he engaged in was considered flagrant insubordination, yelling or threatening a supervisor, yelling and intimidating a supervisor." *Id.* at 71-72. When asked whether she had made up her mind to terminate Pierle before she met with Pierle on June 12, 2006,

Allen said,"I had prepared the documentation and when I sat with him to have the conversation, we were going to listen to what he had said, and if he had not said anything that would preclude us from the decision, we would have made the decision, as we did, to terminate him in that meeting." *Id.* at 21.

A meeting was set for June 12, 2006, with Hendrickson, Debbie Aull ("Aull"), Allen, and Pierle. Hendrickson Dep. at 106; Allen Dep. at 21. Allen recalled that she asked Hendrickson to get Pierle and bring him to the meeting. *Id.* at 22. Allen testified that the following occurred a the meeting:

> . . . I asked Jim why—if he understood why he was there and he said yes, because he had yelled at Sharon. And I said yes, we wanted to speak to him about it.
>
> I asked Jim what happened and he shared with us what had happened. I am not certain whether there was additional conversation before I presented him with the letter. I presented him with a letter which I believe you have reviewed. Jim said he was upset. He said something to the effect of, "This is unfair." He became angry . . . .

Allen Dep. at 22. Pierle was terminated on June 12, 2006, during that meeting.

Pierle's recollection of the meeting is different. First, Pierle recalls that Bill Steel, had of security, also attended the meeting. Pierle Dep. at 126. According to Pierle, "The very first question out of my mouth was, 'Am I fired?'" *Id.* at 127. He testified that Allen anwered, "Yes." *Id.* at 126-27. Pierle stated further, "No prior communications about anything, and she started this closing, throwing the paperwork in front of me and disclosing that they wanted me to fire them [sic] and listen to their severance package offer, stuff like that. I just at that point was in disbelief that— f what was occurring . . . ." *Id.* at 127. Pierle recalls that "they" told him they were firing him for insubordination. *Id.* Specifically, Pierle testified that "they embellished on flagrant insubordination,

9

threatening, intimidating, like I was finger waiving and a lot of other things insinuating that I—which, without having heard my side of the story, I'm just—was surprised to hear." *Id.*

Pierle complains that he was terminated in retaliation for his having filed for intermittent FMLA leave. He must show, either by direct or indirect proof that his termination was motivated by an impermissible purpose. *See Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Under the indirect method, Pierle must establish a prima facie case of discrimination. Upon establishing a prima facie case, he raises a presumption of discrimination, which the Museum must rebut with the presentation of evidence of a non-discriminatory explanation for the termination. If the Museum meets its burden, then Pierle must show that the Museum's explanation is pretextual. *See Manie v. Porter*, 394 F.3d 977, 984 (7th Cir. 2005). In order to prevail on his claim, Pierle must show that he was engaging in protected activity, performing his job satisfactorily, that he suffered an adverse employment action, and that at least one similarly situated employee not in his protected class got more favorable treatment. *See Gordon v. United Airlines, Inc.*, 246 F.3rd 878, 885-886 (7th Cir. 2001).

The Museum avers that Pierle was terminated for insubordination as a result of the conversation between Hendrickson and Pierle on June 6, 2006. He was fired by Allen after she had reviewed a memo from Hendrickson sent to her on June 7, 2007.

As part of his prima facie case for his FMLA retaliation claim, Pierle must show that he was engaged in some type of protected activity. Pierle asserts that his protected activity was filing for FMLA leave. However, Pierle's FMLA leave application was not completed until the afternoon of the day on which he was fired. Even so, Allen was aware that the application was in the pipeline. "[W]hen an employee raises the issue of whether the employer discriminated against an employee

10

by taking adverse action against the employee for having exercised an FMLA right, the question of intent is relevant. The issue becomes whether the employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1017 (7th Cir. 2000) (quoting *King v. Preferred Tech. Group*, 166 F.3d 887, 891 (7th Cir. 1999)).

It is very difficult to conclude that Pierle was fired for attempting to exercise FMLA rights when his application for FMLA leave had not been completed at the time Allen fired him. There is no evidence of any statement from any management team member that FMLA leave was frowned upon. Nor is there any evidence that FMLA leave had anything at all to do with termination of his employment. The only possible argument is that because Pierle was fired during the FMLA leave process he must have been fired because of the FMLA leave application.

The reason given by the Museum for firing Pierle was insubordination. This alleged event of insubordination occurred some five days prior to termination of Pierle's employment. The evidence is that every individual identified who has been accused of insubordination by the Museum has been fired. Randy Johnson was placed on probation before he was fired but there was no one incident that was considered egregious enough in his case to fire him without a second chance. Allen Dep. at 100.

Pierle asserts that he was not insubordinate. He claims that in the June 12, 2006, meeting during which he was fired, he did not get an opportunity to explain his side of the June 6, 2006, conversation with Hendrickson. The inference that he wishes the Court to draw is that because he has created a material issue of fact about what happened on June 6, 2006, that is whether he was indeed subordinate or not, and because he was not given an opportunity to dispute Hendrickson's report about the June 6, 2006, meeting during the June 12 meeting with Allen, the Museum's stated

reason for his firing is a pretense. The Court dispenses with the burden shifting framework and finds that no reasonable fact finder could conclude on the evidence in this case that Pierle's termination was in retaliation for submitting medical forms. There is simply no evidence of a connection between the act of insubordination that led to Pierle's termination and Pierle's application for FMLA leave.

### III. CONCLUSION

For the reasons stated herein, the Court **GRANTS** defendant's, the Children's Museum of Indianapolis, Inc., Motion for Summary Judgment on the claims brought against it by plaintiff, James Pierle. Judgment shall enter accordingly.

IT IS SO ORDERED this 3rd day of November, 2008.

*[signature]*
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Electronically distributed to:

Kenneth E. Lauter
HASKIN LAUTER & LARUE
klauter@hlllaw.com

Jay Meisenhelder
HASKIN LAUTER & LARUE
jmeisenhelder@hlllaw.com

Bradley L. Wilson
HASKIN LAUTER & LARUE
bwilson@hlllaw.com

David W. Gray
LEWIS & KAPPES
dgray@lewis-kappes.com

William McHenry Horne
LEWIS & KAPPES
whorne@lewis-kappes.com